1   Steven S. Baik (SBN 184622)
    sbaik@sidley.com
2   Ryuk Park (SBN 298744)
    ryuk.park@sidley.com
3   SIDLEY AUSTIN LLP
    1001 Page Mill Road, Building 1
4   Palo Alto, CA 94304
    Telephone: +1 650 565 7074
5   Facsimile: +1 650 565 7100

6   Rollin A. Ransom (SBN 196126)
    rransom@sidley.com
7   SIDLEY AUSTIN LLP
    555 West Fifth Street
8   Los Angeles, CA 90013
    Telephone: +1 213 896 6047
9   Facsimile: +1 213 896 6600

10  Ketan V. Patel (*pro hac vice*)
    ketan.patel@sidley.com
11  SIDLEY AUSTIN LLP
    787 Seventh Avenue
12  New York, NY 10019
    Telephone: +1 212 839 5300
13  Facsimile: +1 650 839 5599

14  (Additional Counsel listed on signature page)

15  *Attorneys for Plaintiffs*
    *PUBG Corporation and PUBG Santa Monica, Inc.*
16

17              UNITED STATES DISTRICT COURT

18            NORTHERN DISTRICT OF CALIFORNIA

19                        OAKLAND

| | |
|---|---|
| 20  PUBG CORPORATION AND PUBG SANTA MONICA, INC., | Case No.  4:18-cv-02010-JSW |
| 21 | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** |
| 22          Plaintiffs, | |
| | Assigned to: Hon. Jeffrey S. White |
| 23          v. | |
| | Date:   September 7, 2018 |
| 24  NETEASE, INC., NETEASE INFORMATION TECHNOLOGY CORPORATION, AND HONG | Time:   9:00 a.m. |
| 25  KONG NETEASE INTERACTIVE ENTERTAINMENT LIMITED, | Place:  Courtroom 5, 2nd Floor |
| 26          Defendants. | |

27

28

# TABLE OF CONTENTS

**Page**

I.      STATEMENT OF ISSUES TO BE DECIDED ....................................................... i

II.     SUMMARY OF ARGUMENT .............................................................................. ii

III.    ARGUMENT ........................................................................................................ 1

    **A.**     PUBG Adequately Alleges Copyright Infringement. ................................... 1

        1.     The Court May Not Consider Extrinsic Materials on a Motion to Dismiss ........................................................................................... 2

            a.     Articles Describing "Generic" or "Common" Elements of the "Battle Royale" Genre Are Not Properly the Subject of Judicial Notice. .............................................................. 2

            b.     Evidence Depicting Current Gameplay of *RoS* and *KO* Is Not Properly the Subject of Judicial Notice. .......................... 6

        2.     Defendants Misstate and Misapply the Relevant Standard ........................... 11

        3.     PUBG's Complaint Alleges Substantial Similarity of Protected Expression. ..................................................................................... 12

            a.     Defendants Ignore Multiple Substantially Similar Elements ............. 12

            b.     The Elements that Defendants Do Address Likewise Reflect Substantial Similarity of Protectable Creative Expression. ............... 14

            c.     The Alleged "Dissimilarities" Are Both Irrelevant and Incorrect. .... 18

        4.     Alternatively, PUBG Has Adequately Alleged Substantial Similarity of the Overall Selection, Arrangement, and Combination of Elements in *BATTLEGROUNDS*. .......................................................................... 19

    **B.**     PUBG'S Trade Dress Claims Are Adequately Alleged. ........................................ 20

        1.     PUBG's Trade Dress Claim Does Not Invade the Copyright Act. ................ 20

        2.     PUBG Adequately Alleges the Protectability of Its Trade Dress. ................. 21

    **C.**     PUBG Adequately Alleges Statutory Unfair Competition. ........................................ 22

    **D.**     PUBG Adequately Alleges Common Law Unfair Competition. .............................. 23

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

5

*Allen v. Acad. Games League of Am., Inc.,*
89 F.3d 614 (9th Cir. 1996) ...................................................................................15

6

*Am. Economy Ins. Co. v. Reboans, Inc.,*
900 F. Supp. 1246 (N.D. Cal. 1994) .......................................................................23

7

8

*AngioScore, Inc. v. TriReme Med., LLC,*
70 F. Supp. 3d 951 (N.D. Cal. 2014) ......................................................................23

9

10

*Apple Computer, Inc. v. Microsoft Corp.,*
35 F.3d 1435 (9th Cir. 1994) ..................................................................................19

11

*Aquawood, LLC v. Toys "R" Us-Delaware, Inc.,*
2016 WL 10576620 (C.D. Cal. Mar. 10, 2016) ......................................................23

12

13

*Asetek Danmark A/S v. CMI USA, Inc.,*
2014 WL 12644295 (N.D. Cal. Nov. 19, 2014) ........................................................3

14

15

*Atl. Rec. Corp. v. Serrano,*
2007 WL 4612921 (S.D. Cal. Dec. 28, 2007)............................................................1

16

*Campbell v. Walt Disney Co.,*
718 F. Supp. 2d 1108 (N.D. Cal. 2010) ....................................................................8

17

18

*Capcom USA, Inc. v. Data East Corp.,*
1994 WL 1751482 (N.D. Cal. March 16, 1994)..........................................12, 15, 16

19

20

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,*
20 Cal. 4th 163 (1999) ............................................................................................22

21

*Craigslist Inc. v. 3Taps Inc.,*
942 F. Supp. 2d 962 (N.D. Cal. 2013) ....................................................................21

22

23

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
539 U.S. 23 (2003)........................................................................................ ii, 20, 21

24

25

*Deckers Outdoor Corp. v. J.C. Penney Co.,*
45 F. Supp. 3d 1181 (C.D. Cal. 2014) ....................................................................21

26

*Diamond Foods v. Hottrix, LLC,*
2016 WL 3880797 (N.D. Cal. Jul. 18, 2016)...........................................................22

27

28

*DocMagic, Inc. v. Ellie Mae, Inc.,*
745 F. Supp. 2d 1119 (N.D. Cal. 2010) ..................................................................21

*Doe ex rel. Kristen D. v. Willits Unified Sch. Dist.*,
  2010 WL 890158 (N.D. Cal. Mar. 8, 2010)........................................................................3

*DuckHole Inc. v. NBC Universal Media LLC*,
  2013 WL 5797204 (C.D. Cal. Sept. 6, 2013) ....................................................................5

*EKB Textiles, Inc. v. Target Corp.*,
  2011 WL 13085924 (C.D. Cal. June 21, 2011) ...............................................................13

*English & Sons, Inc. v. Straw Hat Restaurants Inc.*,
  2015 WL 4314364 (N.D. Cal. Jul. 15, 2015)....................................................................22

*First Brands Corp. v. Fred Meyer, Inc.*,
  809 F.2d 1378 (9th Cir. 1987) .........................................................................................23

*Fitbug Ltd. v. Fitbit, Inc.*,
  78 F. Supp. 3d 1180 (N.D. Cal. 2015) .............................................................................23

*French W., Inc. v. Macy's Inc.*,
  2013 WL 12133844 (C.D. Cal. Jan. 29, 2013) ..................................................................4

*Frybarger v. Int'l Bus. Machines Corp.*,
  812 F.2d 525 (9th Cir. 1987) .......................................................................................4, 12

*Gilligan v. Jamco Dev. Corp.*,
  108 F. 3d 246 (9th Cir. 1997) ...........................................................................................1

*Heartland Payment Sys., Inc. v. Mercury Payment Systems, LLC*,
  2015 WL 3377662 (N.D. Cal. Feb. 24, 2015) ................................................................23

*Kasky v. Nike, Inc.*,
  27 Cal. 4th 939 (2002) ....................................................................................................22

*LA Printex Indus. v. Aeropostale, Inc.*,
  676 F.3d 841 (9th Cir. 2012) ......................................................................................2, 18

*Law Offices of Mathew Higbee v. Expungement Assistance Servs.*,
  214 Cal. App. 4th 544 (2013) .........................................................................................23

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) ............................................................................ ii, 2, 3, 11

*Luxul Tech. Inc. v. Nectarlux, LLC*,
  78 F. Supp. 3d 1156 (N.D. Cal. 2015) ............................................................................22

*Mercado Latino, Inc. v. Indio Products, Inc.*,
  2017 WL 1356315 (C.D. Cal. Apr. 11, 2017) .................................................................22

*Metcalf v. Bochco*,
  294 F.3d 1069 (9th Cir. 2002) ............................................................... ii, 1, 13, 19

*Morton & Bassett, LLC v. Organic Spices, Inc.*,
    2017 WL 1425908 (N.D. Cal. Apr. 21, 2017) ................................................................22

*In re Network Equip. Techs., Inc., Litig.*,
    762 F. Supp. 1359 (N.D. Cal. 1991) ..................................................................... ii, 2

*O'Connor v. Uber Techs., Inc.*,
    58 F. Supp. 3d 989 (N.D. Cal. 2014) ....................................................................23

*OHC Group LLC v. Blip, LLC*,
    2010 WL 1151227 (C.D. Cal. Jun. 7, 2010) ........................................................22

*Openwave Messaging, Inc. v. Open-Xchange, Inc.*,
    2016 WL 6393503 (N.D. Cal. Oct. 28, 2016)......................................................23

*People v. E.W.A.P., Inc.*
    106 Cal. App. 3d 315 (1980) ...............................................................................22

*Rentmeester v. Nike Inc.*,
    883 F.3d 1111 (9th Cir. 2018) ...............................................................................1

*Salt Optics, Inc. v. Jand, Inc.*,
    2011 WL 13055856 (C.D. Cal. 2011).................................................................21

*Sambonet Paderno Industrie, S.P.A. v. Sur La Table, Inc.*,
    2015 WL 4498795 (C.D. Cal. Jul. 23, 2015) ......................................................21

*Satava v. Lowry*,
    323 F.3d 805 (9th Cir. 2003) .........................................................................12, 19

*Shaw v. Lindheim*,
    919 F.2d 1353 (9th Cir. 1990) ....................................................................2, 20, 21

*Sheldon v. MGM Pictures Corp.*,
    81 F.2d 49 (2d Cir. 1936) .....................................................................................18

*Spry Fox LLC v. LOLApps Inc.*,
    2012 WL 5290158 (W.D. Wash. Sep. 18, 2012)................................................. *passim*

*Swirsky v. Carey*,
    376 F.3d 841 (9th Cir. 2004) .........................................................................1, 12, 19

*Thomas v. Walt Disney Co.*,
    2008 WL 425647 (N.D. Cal. Feb. 14, 2008) ......................................................8,9

*Touchpoint Comms., LLC v. Dentalfone, LLC*,
    2015 WL 5918400 (W.D. Wash. Oct. 9, 2015)...................................................20

*Williams v. Cavalli*,
    2015 WL 1247065 (C.D. Cal. Feb. 12, 2015)................................................ ii, 20, 21

*Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1129 (C.D. Cal. 2007) ........................................5, 15

**Statutes**

15 U.S.C. § 43(a) ..............................................................................................................20, 23

Cal. Bus. & Prof. Code § 17200 ......................................................................................22

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) .....................................................................................................1, 2

I.      **STATEMENT OF ISSUES TO BE DECIDED**

1.      Does PUBG's Second Amended Complaint ("SAC") state a claim for copyright infringement where the SAC includes numerous allegations of substantial similarity of protectable expressive elements, and where Defendants' motion to dismiss (i) relies on evidence not properly considered on a MTD or judicially noticeable, (ii) mischaracterizes and misapplies copyright law, and (iii) offers no response whatsoever to several allegations of substantial similarity?

2.      Does the SAC state a claim for trade dress infringement where it is based upon a "passing off" theory and is therefore distinct from PUBG's claim under the Copyright Act?

3.      Does the SAC state a claim for statutory unfair competition where the allegations of injury plainly satisfy UCL standing and underlying violations of law, unfair practices, and fraudulent practices are adequately alleged?

4.      Does the SAC state a claim for common law unfair competition where it is premised on a viable trade dress infringement claim and thus not preempted by the Copyright Act?

## II.    SUMMARY OF ARGUMENT

Defendants' attack on PUBG's complaint is baseless.  PUBG is not seeking "to monopolize the popular 'battle royale' genre of video games," Defs.' Mem. at 1:2-3 – instead, it seeks to protect its *creative* expression of *unique* and *distinctive* elements within its *BATTLEGROUNDS* game. Those distinctive and protectable elements have been blatantly copied by Defendants in not one, but two, competing games.  Copyright law protects both these individual elements and the overall selection and combination of these elements against such flagrant misappropriation.

Defendants' motion to dismiss PUBG's copyright infringement claim fails because it depends entirely upon material that is outside the scope of the complaint and not subject to judicial notice.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *In re Network Equip. Techs., Inc., Litig.*, 762 F. Supp. 1359, 1363 (N.D. Cal. 1991) ("The Court should not use judicial notice to generate an evidentiary record and then weigh evidence…to dismiss plaintiffs' complaint."). Defendants' motion fails on the merits as well, because PUBG's SAC more than amply alleges that each of the numerous *BATTLEGROUNDS* elements identified in the SAC are protectable "specific details of an author's rendering of ideas."  *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002); *Spry Fox LLC v. LOLApps Inc.*, 2012 WL 5290158, at *5 (W.D. Wash. Sep. 18, 2012).  Defendants conveniently, and fatally, ignore the SAC's identification of numerous protectable features that are substantially similar in *RoS* and *KO*, and their attempted reliance on alleged differences between the works is both improper (as many were created after PUBG initiated this lawsuit) and irrelevant (as copyright infringement is evaluated based on substantial similarity, not on ancillary differences).

Defendants' motion to dismiss PUBG's Lanham Act claim fails because it is based upon a misinterpretation of *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), which does not apply to allegations (like those here) of "passing off," *see, e.g.*, *Williams v. Cavalli*, 2015 WL 1247065, at *5 (C.D. Cal. Feb. 12, 2015), and because PUBG adequately alleges the protectability of its trade dress.  And finally, Defendants' motion as to PUBG's statutory and common law unfair competition claims fails because their arguments rely entirely on their ability to defeat the Lanham Act claim, which as set forth herein, clearly survives Defendants' challenge.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   ARGUMENT

Dismissal of a claim under Rule 12(b)(6) is proper only in "extraordinary" cases. *Atl. Rec. Corp. v. Serrano*, 2007 WL 4612921, at 2 (S.D. Cal. Dec. 28, 2007) (citing *U.S. v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981)); *Gilligan v. Jamco Dev. Corp.*, 108 F. 3d 246, 249 (9th Cir. 1997) (motions to dismiss are "viewed with disfavor" and are to be granted rarely).  The court must "assume the truth of all of the complaint's factual allegations and credit all reasonable inferences arising from its allegations." *Spry Fox LLC v. LOLApps Inc.*, 2012 WL 5290158, at *2 (W.D. Wash. Sept. 18. 2012).  When a plaintiff alleges facts sufficient to state a claim, "its complaint survives dismissal as long as there is 'any set of facts consistent with the allegations in the complaint' that would entitle the plaintiff to relief."  *Id.* at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007), and *Ashcroft v. Iqbal*, 550 U.S. 662, 679 (2009)).

### A.   **PUBG Adequately Alleges Copyright Infringement.**

To state a claim for copyright infringement, a plaintiff must allege (1) that it owns the copyright in a particular work, and (2) that defendant copied original elements in the work.  *Metcalf v. Bochco*, 294 F. 3d 1069, 1072 (9th Cir. 2002).  Copying may be established by showing that defendant had access to the copyrighted work and that there is substantial similarity between the two works. *Id.*  To determine whether two works are substantially similar, the Ninth Circuit applies a two-part analysis: "an objective extrinsic test and a subjective intrinsic test."  *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004). "The extrinsic test considers whether two works share a similarity of ideas and expression as measured by external, objective criteria." *Id.* The intrinsic test then considers whether "subjectively[,] the ordinary, reasonable person would find the total concept and feel of the [two works] to be substantially similar." *Id.* at 847.  "Only the extrinsic test's application may be decided by the court as a matter of law, so that is the only test relevant…on a motion to dismiss." *Rentmeester v. Nike Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018) (citation omitted).

Here, the only question raised by Defendants' motion to dismiss is whether PUBG has adequately alleged substantial similarity between *BATTLEGROUNDS* and Defendants' video games *Rules of Survival* ("*RoS*") and *Knives Out* ("*KO*").  However, the Ninth Circuit has warned that a dismissal is "not highly favored on questions of substantial similarity in copyright cases."  *Shaw v.*

1   *Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990).  Thus, Defendants' motion to dismiss must be

2   denied if PUBG's complaint identifies ***any*** set of "articulable similarities" between "specific

3   expressive elements" of works.  *LA Printex Indus. v. Aeropostale, Inc.*, 676 F.3d 841, 848 (9th Cir.

4   2012).  PUBG's complaint readily meets this standard.

5          1.      The Court May Not Consider Extrinsic Materials on a Motion to Dismiss.

6          Defendants' motion fails before it even begins, because it depends entirely upon material

7   outside the scope of the complaint.  Courts generally "may not consider any material beyond the

8   pleadings in ruling on a Rule 12(b)(6) motion."  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th

9   Cir. 2001).  Defendants seek to avoid this limitation by asking that the Court take judicial notice of

10  various extrinsic "materials and facts," ostensibly based upon exhibits submitted with the

11  Declaration of Michael LaFond.  *See* Defs.' Req. for Jud. Not. ("RJN") (Dkt. No. 47-2) at 1:1–3:5;

12  Declaration of Michael F. LaFond ("LaFond Decl.") (Dkt. Nos. 47-3 – 47-26).  While materials that

13  are *properly* subject to judicial notice fall within a narrow exception to the above rule, a court must

14  proceed with caution:

15          The Court should not use judicial notice to generate an evidentiary record and then
           weigh evidence – which plaintiffs have not had the opportunity to challenge – to
16          dismiss plaintiffs' complaint. While defendants' arguments on the facts may
           ultimately prevail upon a motion for summary judgment or at trial, they do not create
17          a basis for dismissing plaintiffs' complaint.

18  *In re Network Equip. Techs., Inc., Litig.*, 762 F. Supp. 1359, 1363 (N.D. Cal. 1991).  This warning is

19  particularly apt here.  As set forth further below, most of the "materials and facts" proffered by

20  Defendants are not properly subject to judicial notice, and therefore cannot be considered in

21  connection with Defendants' motion.

22          a.      *Articles Describing "Generic" or "Common" Elements of the "Battle*
                   *Royale" Genre Are Not Properly the Subject of Judicial Notice.*

23

24          Defendants proffer several third-party articles that Defendants contend set forth the

25  "elements" of the relatively new "battle royale genre."  *See* RJN at 1:16–24, 5:14–6:13; LaFond

26  Decl. Exs. 6–9.  Defendants then rely upon these extrinsic materials in an effort to define a "genre"

27  and to "filter out" numerous similar elements that Defendants claim are "common" elements of such

28  a "genre."  *See, e.g.*, Defs.' Mem. at 5:10–15, 7:16–8:3.  Defendants' reliance on these materials is

1   improper and must be rejected for multiple reasons.

2   First, each of the articles underlying the RJN purports to define the scope of the battle royale

3   genre. *See, e.g.*, LaFond Decl., Ex. 6 at 2 (purporting to identify the "basic framework of a [battle

4   royale] match"); LaFond Decl., Ex. 7 at 1 (ostensibly identifying "elements [that] define the Battle

5   Royale genre"); LaFond Decl., Ex. 8 at 2 (referencing a "simple formula" as the "basis of Battle

6   Royale games"); LaFond Decl., Ex. 9 at 1 ("Battle-royale games hew to a few core mechanics . . .").

7   Defendants then cite (or miscite) these articles as evidence of the matters asserted therein – the

8   authors' individual descriptions of a battle royale game. *See, e.g.*, RJN at 1:16–24; *see also* RJN at

9   6:15-16 ("Commencing a game by dropping a large number of players into a location is a common

10  element of a video game design . . .") (citing LaFond Decl., Ex. 7); RJN at 7:11–12 ("A battle setting

11  with buildings and obstacles for players to overcome is a common element of [battle royale]

12  games.") (citing LaFond Decl., Ex. 7).  However, because these articles are being offered to prove

13  the truth of the matters asserted therein, they are inadmissible hearsay.  *See, e.g.*, *Asetek Danmark*

14  *A/S v. CMI USA, Inc.,* 2014 WL 12644295, at *2 (N.D. Cal. Nov. 19, 2014) ("Statements reported in

15  magazine articles and newspapers are hearsay if offered to prove the truth of the matter asserted.").

16  Defendants' submission of and reliance on them is therefore improper, and they must be disregarded.

17  Second, the submission of Exhibits 6-9 is also improper under Fed. R. Civ. P. 26(a)(2).  Each

18  article provides the author's opinion regarding the rules of the battle royale genre.  Defendants have

19  not produced expert reports for these authors, and extrinsic expert testimony at the motion to dismiss

20  stage would be improper in any event.  *Lee*, 250 F.3d at 688.

21  Finally, even if these publications were not inadmissible hearsay or opinion evidence, the

22  Court should nevertheless exclude these exhibits and deny Defendants' corresponding requests for

23  judicial notice.  "Federal Rule of Evidence 201(b) authorizes a court to take judicial notice of facts

24  'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably

25  be questioned.'"  *Doe ex rel. Kristen D. v. Willits Unified Sch. Dist.*, 2010 WL 890158, at *2 (N.D.

26  Cal. Mar. 8, 2010).  However, a court may not "take judicial notice of a fact that is 'subject to

27  reasonable dispute.'"  *Id.* (quoting *Lee*, 250 F.3d at 689–90 (citing Fed. R. Evid. 201(b)).

28  Accordingly, courts have refused to take judicial notice of allegedly "generic" or "stock" elements

1   where such elements are not "generally known" or capable of being "readily determined" from

2   indisputably accurate sources.  *See, e.g., Silas v. Home Box Office, Inc.*, 2016 WL 4251599, at *6-7

3   (C.D. Cal. July 25, 2016) (alleged "elements common to prior works" not properly subject to judicial

4   notice, as they were "not 'generally known within the [] court's territorial jurisdiction,' nor would it

5   be possible to 'accurately and readily determin[e]' the existence of these elements by using 'sources

6   whose accuracy cannot reasonably be questioned'") (quoting Fed. R. Evid. 201(b)); *Dahl v. Toyota*

7   *Motor Sales USA, Inc.*, 2015 WL 1034342, at *3 (D. Nev. Mar. 10, 2015) (refusing to take judicial

8   notice of allegedly common storyline:  website contents "do not conclusively establish that the

9   storyline...is common and prevalent") (internal quotations omitted); *see also French W., Inc. v.*

10  *Macy's Inc.*, 2013 WL 12133844, at *2 (C.D. Cal. Jan. 29, 2013) (denying motion to dismiss where

11  "threshold understanding of what elements are 'stock' and therefore unprotectable…[requires]

12  further development of the record to inform us of the scope"); *cf. Frybarger v. Int'l Bus. Machines*

13  *Corp.*, 812 F.2d 525, 527–28 (9th Cir. 1987) (considering "several affidavits from videogame,

14  programming, and software experts submitted by each side" on summary judgment before

15  addressing scope of copyright protection in videogame elements).

16          This standard is not remotely met here.  As an initial matter, even the sources provided by

17  Defendants do not identify a common set of factors with respect to this so-called "genre."  For

18  example, Exhibit 6 describes "the basic framework of a [battle royale] match [as] one big map, a

19  large pool of players, randomized gear to find, and a slowly shrinking battle arena to force

20  combatants into more tense confrontations."  However, Exhibit 7 adds the requirements that (1) the

21  players "[s]tart with nothing;" (2) the game include "[c]aches and chests" that "contain[] high quality

22  gear, weaponry ammo and useful other supplies;" and (3) that "100 people drop onto an island

23  empty handed."  Exhibit 8 requires only "a large group of equal players, a huge map that slowly

24  shrinks over time, and scarce guns and ammo."  Finally, Exhibit 9 requires only "a few core

25  mechanics":  (1) helplessness; (2) an ever-growing external threat in order to force all players into a

26  smaller and smaller area; and (3) that a player's death be final.

27          Moreover, Defendants' proposed list of "generic elements" – (1) "Launching a game by an

28  'air jump,' where a large number of players are dropped into a setting;" (2) "Requiring players to

1   search for and acquire equipment, weapons and ammunitions, armor, clothing and equipment;" (3)

2   "A large map that shrinks over time;" and (4) "A scene containing buildings" (RJN, 1:15–24) – then

3   conflicts with those same sources.  For example, Defendants' list ignores the requirement from

4   Exhibit 7 that there be "[c]aches and chests . . . containing high quality gear."  LaFond Decl., Ex. 7

5   at 1.  And Defendants' list adds elements not recited in Exhibit 9 including the "drop" mechanism,

6   the requirement for buildings, and the proposition of a "shrinking map" (rather than a more general

7   "external threat") to force players closer together.  LaFond Decl., Ex. 9 at 1.  In short, Defendants'

8   own submission demonstrates the impropriety of judicial notice here.

9           Defendants nonetheless assert that judicial notice is appropriate where the elements "can be

10   readily determined from examining popular media."  RJN at 5:4–5 (citing *Zella v. E.W. Scripps Co*.,

11   529 F. Supp. 2d 1124, 1129 (C.D. Cal. 2007)).  However, Defendants misstate the holding in *Zella*.

12   *Zella* found that generic elements of a television show could be verified "simply by watching

13   television for any length of time."  *Id*. (taking judicial notice that a host, guest celebrities, interview,

14   and cooking are generic elements of television cooking shows because they "can be verified simply

15   by watching television for any length of time"); *see also DuckHole Inc. v. NBC Universal Media

16   LLC*, 2013 WL 5797204, at *4 (C.D. Cal. Sept. 6, 2013) (taking judicial notice that veterinary-

17   themed sitcoms have generic elements including: (1) settings of an operating room, examination

18   room, and lobby; (2) pets; (3) a comedic tone; and (4) romantic relationships, because they "can be

19   verified simply by watching television for any length of time").  In each of these cases, the court

20   evaluated whether generic elements of a specific medium could be determined by a cursory

21   examination *of that medium itself*.  Here, Defendants do not suggest that the generic elements of

22   battle royale games "can be verified simply by watching [or playing battle royale games] for any

23   length of time."  Instead, they ask the Court to rely on the selected and inconsistent opinions of

24   limited reviewers and authors in the field.  That the Court may not do.

25           For all of the foregoing reasons, PUBG objects to Exhibits 6–9 of the LaFond Declaration,

26   and asks that the Court deny Defendants' corresponding request for judicial notice (RJN Items 6–9).

27

28

5

1

        b.    *Evidence Depicting Current Gameplay of RoS and KO Is Not Properly the*
              *Subject of Judicial Notice.*

2

3          Defendants also ask that the Court take judicial notice of the *current* versions of *RoS* and *KO*,

4    and of videos and screenshots of gameplay from those current releases.  RJN at 1:7–14, 4:17–23,

5    8:11–17; LaFond Decl. Exs. 3–5, 16–21.  Defendants then rely upon these materials in an effort to

6    establish differences between the parties' respective games.  Defs.' Mem. at 9:11–11:2.  While the

7    Court may take judicial notice of works referenced in a complaint, the materials submitted with the

8    RJN *differ from the versions referenced in the complaint* – as set forth in greater detail below,

9    Defendants have made changes to both games in an effort to create alleged dissimilarities that did

10   not exist at the time of PUBG's original filing.  Whatever the bounds of the "incorporation by

11   reference" doctrine, it does not extend to works that were changed relative to versions depicted in

     the complaint, solely to fabricate dissimilarities.

12

            i.    <u>Defendants Fail to Identify What Changes Have Been Made to the</u>
                  <u>Playable Copies of *RoS* and *KO* Submitted to the Court.</u>

13

14         Defendants first request that the Court take judicial notice of certain works referenced in the

15   SAC.  RJN at 4:8–10 (addressing RJN Items 4 & 5).  They contend that the versions of *RoS* and *KO*

16   identified in the RJN "are properly subject to judicial notice…as the content of these audiovisual

17   works are alleged in the SAC, and their authenticity is not questioned."  *Id*.  Defendants misstate the

18   law.  If the documents are not attached to a complaint, they may be considered if their "authenticity

19   is not contested ***and the complaint 'necessarily relies on them***.'"  *Hawthorne v. Umpqua Bank*,

20   2013 WL 5781608, at *4 (N.D. Cal. Oct. 25, 2013) (emphasis added).  Although Defendants contend

21   that the "contents of [*RoS* and *KO*] are referenced in the SAC" and therefore these applications are

22   incorporated by reference in the SAC (RJN at 4:21–23), the versions relied upon in the SAC are *not*

23   the same as those Defendants have submitted to the Court.

24         Since the initial publication of *RoS* in November 2017, Defendants have implemented at least

25   37 updates including 18 updates subsequent to the April 2, 2018 filing of this action.  *See*

26   https://www.facebook.com/pg/RulesofSurvival/notes/.  These revisions range from modification to

27   optimize gameplay (*see* https://www.facebook.com/notes/rules-of-survival/patch-notes_nov-22-

28   2017/1364767880300504/) to the addition of new weapons and armor (*see*

6

1    https://www.facebook.com/notes/rules-of-survival/patch-notes_july-18-2018/1620506608059962/).

2    These updates demonstrate that earlier versions of *RoS* did not include many (if not all) of the

3    "dissimilar features" Defendants point to in their motion.  For example, Defendants contend "each

4    game contains twice [as] many weapons" as identified in the SAC.  Defs.' Mem. at 10:10–11.

5    Defendants fail to note that many of the weapons in *RoS* were also added *after* its release and even

6    after the commencement of this litigation.  *See* https://www.facebook.com/notes/rules-of-

7    survival/patchnotes_feb-7-2018/1442886739155284/ (adding shotguns);

8    https://www.facebook.com/notes/rules-of-survival/patch-notes_july-18-2018/1620506608059962/

9    (adding crossbow in July 2018 – over three months after the commencement of this litigation);

10   https://www.facebook.com/notes/rules-of-survival/patch-notes_july-25-2018/1631498196960803/

11   (adding riot shield in July 2018); https://www.facebook.com/notes/rules-of-survival/patch-

12   notes_april-4-2018/1501798429930781/ (adding grenade gun and Damascus knife in April 2018).

13   Defendants also fail to note that the "different" mood, themes and settings in *RoS* were also post-

14   release additions.  *See* Defs.' Mem. at 9:22–25; *see also* https://www.facebook.com/notes/rules-of-

15   survival/patch-notes_nov-30-2017/1374527502657875/ (adding weather system that includes

16   "Sunny, Foggy, Dusk and Dawn"); https://www.facebook.com/notes/rules-of-

17   survival/patchnotes_feb-7-2018/1442886739155284/ (adding "new map [which] will include various

18   new areas, including swamps, gardens, and mines").  These updates show that at least *some* versions

19   of *RoS* published to consumers did not contain any or all of the "dissimilar features" identified in

20   Defendants' motion.

21       Similarly, since the initial publication of *KO*, Defendants have implemented at least 21

22   updates to add dissimilarities including 9 updates since the commencement of this litigation.  *See*

23   https://www.facebook.com/pg/KnivesOutGame/notes/.  These updates range from measures

24   designed to reduce cheating in the game (https://www.facebook.com/notes/knives-out/patch-

25   notes_dec-8-2017/237773343425568/) to the addition of new articles of clothing

26   (https://www.facebook.com/notes/knives-out/july-25-update-note/350998018769766/).  However, as

27   with *RoS*, the updates demonstrate that many of the purported differences in creative expression

28   between *BATTLEGROUNDS* and *KO* were added only *after KO*'s initial release.  For example,

1   Defendants allege that the air jump sequence in *KO* is depicted "as a group of helicopters."  Defs.'

2   Mem. at 10:2.  However, as shown in the SAC, this sequence was first depicted using an airplane

3   similar to the one used in *BATTLEGROUNDS*.  SAC ¶ 90.  The use of helicopters was not added

4   until approximately two months after *KO*'s release.  *See* https://www.facebook.com/notes/knives-

5   out/ko-santa/244495152753387/.  As with *RoS*, Defendants fail to note that many of the *KO*

6   weapons were added after its initial release including after the commencement of this litigation.  *Cf.*

7   Defs.' Mem. at 10:10–11; *see* https://www.facebook.com/notes/knives-out/january-18-update-

8   notes/256377904898445/ (adding SVD sniper rifle); https://www.facebook.com/notes/knives-

9   out/february-1-update-notes/261986334337602/ (adding QBZ-95 rifle and VAL silenced sniper

10  rifle); https://www.facebook.com/notes/knives-out/february-7-update-notes/264620287407540/

11  (adding AUG rifle and M27 rifle); https://www.facebook.com/notes/knives-out/may-30-update-

12  note/306800766522825/ (adding QCW-05).  Similarly, although Defendants allege that "Knives Out

13  uses a broader range of colors, with ample use of purples and pinks[,] white snow in some areas and

14  green grass in others," Defs.' Mem. at 9:19, many of these features were added after PUBG brought

15  this suit.  *See*, *e.g.*, https://www.facebook.com/notes/knives-out/hurricane-assault-has-

16  arrived/247876605748575/ (revealing new map which includes "a mysterious castle atop a snowy

17  mountain[,] rolling plains to a tropical seaside town [and] a romantic lavender field to a majestic

18  missile launch site").  Although Defendants argue that "[t]he court . . . . must take judicial notice if a

19  party requests it and the court is supplied with the necessary information" (RJN at 3:25–27 (quoting

20  Fed. R. Evid. 201)), Defendants make no mention of these modifications, let alone makes any

21  attempt to supply necessary information – such as when these modifications were implemented – to

22  the Court.

23        In support of their position that the Court should take judicial notice of modified versions of

24  the infringing works, Defendants rely on two readily distinguishable cases:  *Campbell v. Walt Disney*

25  *Co.*, 718 F. Supp. 2d 1108, 1111 n.3 (N.D. Cal. 2010), and *Thomas v. Walt Disney Co.*, 2008 WL

26  425647, at *2 n.1 (N.D. Cal. Feb. 14, 2008).  Unlike the works here, which are continuously being

27  modified, in each of the cited cases, the court took judicial notice of static works of art – a motion

28  picture and a written screenplay.  *Campbell*, 718 F. Supp. at 1111 n.3 (taking judicial notice of the

1   film "*Cars*" and a copy of the screenplay for "The Challenge" filed with the Copyright Office);

2   *Thomas*, 2008 WL 425647, at *2 n.1 (taking judicial notice of the film "*Finding Nemo*" and the

3   screenplay "*Squisher the Fish*").  In both cases, there was no concern that the works had been

4   changed between their initial release and their consideration by the Court.

5           For all of the foregoing reasons, PUBG objects to Defendants' request that the Court take

6   judicial notice of the current releases of *RoS* and *KO*, and thus to the letter in the LaFond Declaration

7   "explaining" how to download those current releases (LaFond Decl., Exs. 4–5).

8                         ii.      The Submitted Videos of *RoS* and *KO* Rely on Features and Updates
                                   Added After the Filing of This Action.
9

10          Defendants further rely on video of gameplay taken from current versions of *RoS* and *KO*, as

11  evidence of alleged differences between their games and *BATTLEGROUNDS*.  RJN at 8.  However,

12  in addition to the differences identified above, these videos demonstrate further additions made

13  *during the course of this litigation* that Defendants are now using to claim dissimilarity between the

14  infringing and copyrighted works.

15          For example, Defendants allege that each game uses "unique costumes and fictionalized gun

16  designs" and, as evidence, cites a "Damascus Knife" from *RoS* which can be displayed as a "glowing

17  purple katana."  Defs.' Mem. at 10:23 (citing LaFond Decl., Ex. 19 at 07:16:20–07:22:29).

18  However, neither the Damascus Knife nor the "glowing purple katana" predate this case.

19  https://www.facebook.com/notes/rules-of-survival/patch-notes_april-4-2018/1501798429930781/

20  ("Added Damascus Knife, a cool new weapon that players can pick up in the game.");

21  https://www.facebook.com/notes/rules-of-survival/patch-notes_june-20-2018/1579137218863568/

22  (June 20, 2018 announcement of "Shadow Panther" set which includes purple katana).  As further

23  evidence of "creative designs" that show dissimilar fanciful expression, Defendants cite "glowing

24  science-fiction-esque guns in *Rules of Survival*."  Defs.' Mem. at 10:25–26 (citing LaFond Decl., Ex.

25  16 at 02:46:20–02:50:12).  The specific "science-fiction-esque" gun in question, however, was

26  added to the game a mere two weeks before Defendants filed their motion to dismiss.  *See*

27  https://www.facebook.com/RulesofSurvival/photos/a.1355601174550508.1073741829.1349433135

28  167312/1599701920140431/?type=3&theater (announcing the Twilight ACR on July 3, 2018).

1    Exhibit 17 highlights the ability of players to graffiti walls in *RoS,* ostensibly as further evidence of

2    "dissimilar fanciful expression."  *See, e.g.*, LaFond Decl., Ex. 17 at 2:55:00–3:00:00.  As with prior

3    examples, this too is a recent June 2018 modification of *RoS*.  *See*

4    https://www.facebook.com/notes/rules-of-survival/patch-notes_june-13-2018/1569437746500182/

5    ("Spray paint content added.").  Defendants similarly attempt to use "clothing, weapons [and]

6    equipment" released in July 2018 to differentiate *KO* from *BATTLEGROUNDS*.  Defs.' Mem. at

7    10:20 (citing LaFond Decl., Ex. 18 at 01:17:08–02:30:16 which depicts "Superior Box July Only"

8    clothing, weapons and equipment); *see also id*. at 10:25 (citing LaFond Decl., Ex. 18 at 01:53:15–

9    02:25:27);https://www.facebook.com/KnivesOutGame/photos/a.227143637821872.1073741827.227

10   051401164429/324964741373094/?type=3&theater (June 28, 2018 announcement that "The July-

11   only Superior Box is here!").

12          As with the playable copies of the infringing works, Defendants' reliance on case law is

13   unavailing.  In *Harold Lloyd Entm't, Inc. v. Moment Factory One, Inc*., 2015 WL 12765142, at *1

14   (C.D. Cal. Oct. 29, 2015), the court took judicial notice of a 1923 silent film and the video portion of

15   a multimedia work.  *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1235 (N.D. Cal. 2014) addressed judicial

16   notice of a video depicting allegedly defamatory statements.  Neither of these cases involved

17   modification of the alleged infringing works.  PUBG therefore objects to Defendants' request that

18   the Court take judicial notice of the video files allegedly showing gameplay of *RoS* and *KO*, and to

19   the corresponding exhibits to the LaFond Declaration (LaFond Decl., Exs. 16–19).

20              iii.    The Submitted Charts of Video Screenshots Rely on Features and
                       Updates Added After the Filing of This Action.
21

22          Finally, Defendants have submitted a number of charts depicting what they claim are features

23   from each infringing work that are dissimilar to *BATTLEGROUNDS*.  As with Exhibits 4, 5 and 16–

24   19, these images depict elements of gameplay from versions of *RoS* and *KO* that were added to the

25   infringing works during the course of this litigation.  *Compare* LaFond Decl., Ex. 20 at 1 (depicting

26   a support droid in *RoS*) *and* https://www.facebook.com/notes/rules-of-survival/patch-notes_may-23-

27   2018/1548629321914358/ (announcing "New Content – Support Droid" on May 23, 2018); *compare*

28   LaFond Decl., Ex. 21 at 4 ("Superior Box July Only" clothing, weapons and equipment) *and*

1   https://www.facebook.com/KnivesOutGame/photos/a.227143637821872.1073741827.22705140116

2   4429/324964741373094/?type=3&theater (June 28, 2018 announcement that "The July-only

3   Superior Box is here!").

4          A court may properly consider documents "not physically attached to the complaint . . . if the

5   documents' authenticity is not contested and the plaintiffs' complaint necessarily relies on them."

6   *Lee*, 250 F.3d at 688 (internal quotation marks and ellipses omitted).  However, Defendants' attempt

7   to import modified gameplay into their motion to dismiss – without informing the Court of the

8   extent, nature and timing of these modifications – entirely ignores the requirement that the evidence

9   in question *be referenced and relied upon in the complaint*.  Defendants' proposal would allow every

10  infringer to attempt to escape liability at the motion to dismiss stage merely by removing or

11  modifying a few infringing features prior to filing the motion.  PUBG therefore objects to

12  Defendants' request that the Court take judicial notice of the screenshots of *RoS* and *KO* and to the

13  corresponding exhibits to the LaFond Declaration (LaFond Decl., Exs. 20–21).[1]

14         Once the Court disregards the material improperly submitted in connection with the RJN,

15  Defendants' motion is left empty.  The motion should be denied for that reason alone.

16         2.     Defendants Misstate and Misapply the Relevant Standard.

17         Defendants also mischaracterize and misapply relevant principles of copyright law.

18  Defendants appear to contend that whenever "two works in the same genre" are to be compared, a

19  plaintiff must show not just substantial similarity, "but the higher standard of 'virtual identity.'"

20  Defs.' Mem. at 8:5–7.  This is wrong.  The "substantial similarity" test is *de riguere* in copyright

21  infringement analysis, including when two works in the same genre are evaluated.  *See, e.g.*,

---

22  [1] Finally, although Exhibit 24 to the LaFond Declaration is not listed in the items for which

23  Defendants request judicial notice (*cf.* RJN at 1:6–3:5), it is referenced elsewhere in the RJN (*see* RJN at 8:25-9:1) and in Defendants' brief (*see* Defs.' Mem. at 7:15).  PUBG objects to Exhibit 24 as

24  irrelevant to the issues in the SAC.  *See Chatman v. Early*, 389 F. App'x 599, 600 (9th Cir. 2010) (affirming district court denial of request for judicial notice of news articles that "did not contain

25  adjudicative facts relevant to the parties' dispute").  Defendants have offered Exhibit 24 as evidence that the phrase "Winner Winner Chicken Dinner" was used prior to its irreverent use in

26  *BATTLEGROUNDS*.  However, PUBG does not claim to have coined the phrase.  Instead, the SAC demonstrates that *BATTLEGROUNDS*' incorporation of this lighthearted phrase in contrast with the

27  dark and morbid themes and goals of a "battle royale" game is a unique, creative, and distinctive expression in PUBG's game that has since been co-opted by Defendants.  *See* SAC ¶ 50.  The

28  phrase's prior use in a movie about "six MIT students who were trained to become experts in card counting" is not relevant to PUBG's claims.

---

11

1    *Swirsky*, 376 F.3d at 843–44 (using substantial similarity test in evaluating "alleged similarity

2    between the choruses of two popular and contemporary rhythm and blues ('R&B') songs").

3           Although Defendants rely on *Capcom USA, Inc. v. Data East Corp.*, 1994 WL 1751482

4    (N.D. Cal. March 16, 1994) ("*Capcom I*"), that case invoked the "virtual identity" standard solely in

5    connection with the "intrinsic test," in considering a motion for preliminary injunction.  *Id.* at *13.

6    However, the "intrinsic test" plays no role on a motion to dismiss, *Swirsky*, 376 F.3d at 845, and

7    *Capcom I* is therefore inapposite.  Moreover, *Capcom I* recognized that the "virtual identity"

8    standard is relevant only "[w]here the alleged similarities in a plaintiff's work consists primarily of

9    elements that are unprotectable, or are capable of only a narrow range of expression."  1994 WL

10   1751482, at *13.  The same is true of Defendants' other cases.  *See Satava v. Lowry*, 323 F.3d 805,

11   812–13 (9th Cir. 2003) (because the range of expression of animals is narrow, requiring virtual

12   identity for infringement of jellyfish sculpture in preliminary injunction analysis, but that numerous

13   elements, including "the pose, attitude, gesture, muscle structure, facial expression, coat, or texture

14   of animal" could be protectable); *Frybarger*, 812 F.2d 525, 527, 529–30 (9th Cir. 1987) (on

15   summary judgment, invoking "virtual identity" standard only as to the "*indispensable* expression of

16   [] ideas, based on the technical requirements of the videogame medium") (emphasis in original).

17          These principles have no application here.  As discussed further below, as to each of the

18   numerous elements identified in the complaint, there was a wide range of expression from which to

19   choose.  The choices made by PUBG – and copied by Defendants in *RoS* and *KO* – were not dictated

20   by "technical requirements of the videogame medium," or by the merger of "idea" into "expression,"

21   or by *scenes a faire* that necessarily flow from the alleged "battle royale genre," or by any other

22   utilitarian or mechanical consideration.  Instead, as the SAC alleges, the elements in

23   *BATTLEGROUNDS* was driven by creative, original considerations, PUBG's expressions of which

24   are entitled to the full extent of copyright protection.  *Spry Fox*, 2012 WL 5290158, at *5

25          3.    <u>PUBG's Complaint Alleges Substantial Similarity of Protected Expression.</u>

26                a.    *Defendants Ignore Multiple Substantially Similar Elements.*

27          Defendants' motion conveniently omits any discussion of most of the substantially similar

28   elements of *BATTLEGROUNDS* that are identified in the SAC.  Even a cursory review of those

1   elements demonstrates the baselessness of Defendants' motion.  To take just one example,

2   Defendants have simply copied multiple buildings depicted in *BATTLEGROUNDS* and incorporated

3   them into *RoS* and/or *KO*.  Examples from the complaint (and ignored by Defendants) appear below.

4   In the first, the buildings have an octagonal shape and identical point of access directly to the second

5   floor via a unique stairway to the right of the building.  In the second, the buildings have identical

6   shapes, structure, and door placement.  While there are modest differences (*e.g.*, in color), these

7   "minor differences serve only to emphasize the extent to which a defendant has deliberately copied."

8   *EKB Textiles, Inc. v. Target Corp.*, 2011 WL 13085924, at *3 (C.D. Cal. June 21, 2011).  More

9   importantly, and contrary to Defendants' claim, there is *nothing* about the "game mechanics,"

10  "rules," or "genre" that required PUBG to adopt these particular building formations, or that required

11  Defendants to copy them.  Instead, they constitute protectable expression because they are "specific

12  details of an author's rendering of ideas." *Metcalf v.* Bochco, 294 F.3d 1069, 1074 (9th Cir. 2002);

13  (SAC ¶¶ 63–64, 94–95):

 

*BATTLEGROUNDS*                     *Knives Out*

 

*BATTLEGROUNDS*                     *Rules of Survival*

25       Another feature copied by Defendants in their games, identified by PUBG in its complaint,

26  and ignored by Defendants in their motion, is the frying pan weapon/"butt armor."  *See* SAC ¶ 73.

27  There is no way to characterize the frying pan as "indispensable" to the idea of last-man-standing

28

games, and no reason – other than by copying – that it would appear in Defendants' game, in the same essential form and with the same qualities (including as posterior armor when not in use):

   

*BATTLEGROUNDS*          *Rules of Survival*          *BATTLEGROUNDS*          *Rules of Survival*

Numerous other discretionary creative elements appear in *BATTLEGROUNDS*, are copied in *RoS* and/or *KO*, are alleged in the complaint, and are ignored by Defendants. These include multiple elements in the game environment, such as (among many others in the complaint):

- the shape and nature of the play map ("a large island in a square-ish shape with a canal leading to a large city, along with a smaller unconnected island") (SAC ¶¶ 62, 93);

- scenes and locations in the play area, including rural aqueducts, shipping containers, and water cooling towers that players parachute over when transporting into the play space (SAC ¶¶ 63, 94), and numerous physical venues in the play area, including a shooting range, ruins, roof decks, and observation towers (SAC ¶¶ 63–64, 94–95).

PUBG's choices of buildings and surroundings constitute "protectable expressive elements." *Spry Fox*, 2012 WL 5290158, at *5. As the *Spry Fox* court noted:

> Spry Fox expressed the idea underlying Triple Town in its own way. It chose an object hierarchy that progresses from grass to bushes to trees to houses and beyond. It chose a bear as the antagonist object and a 'bot' as the object with the power to destroy others. It chose its own visual depiction of each of these objects. It placed all of these objects on a field of play that resembles a field or meadow. These are protectable expressive elements…. These objective elements of expression are within the scope of Spry Fox's copyright.

*Id.* The same analysis applies with equal force here.

### b. *The Elements that Defendants Do Address Likewise Reflect Substantial Similarity of Protectable Creative Expression.*

PUBG's protectable expression (and Defendants' infringement of it) is not limited to the elements that Defendants have ignored. On the contrary, as discussed further below, *every one* of

14

1    the elements identified by Defendants likewise includes protectable expression copied by

2    Defendants.  These numerous similarities (and the many others alleged in the complaint) render the

3    cases upon which Defendants rely readily distinguishable; the number and nature of similarities in

4    those cases (even as described by Defendants) is dwarfed by those in *BATTLEGROUNDS* and *RoS*

5    and *KO*.  *Cf.* Defs.' Mem. at 3:28–4:18 (citing *Capcom Co. v. MKR Grp., Inc.*, 2008 WL 4661479

6    (N.D. Cal. Oct. 20, 2008), and *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124 (C.D. Cal. 2007)).

7    **Character Attributes.**  The energy boost bar and health status features in

8    *BATTLEGROUNDS* are not unprotectable "mechanics that flow from the idea of forcing players to

9    kill each other."  Defs.' Mem. at 5:18–19.  Instead, they reflect protectable expression that

10   Defendants copied.  Defendants cite *Capcom I* in support of their argument, but that case addressed a

11   more generic and "commonplace" allegation that "tracking a fighter's vitality" was copied.  *Capcom*

12   *I*, 1994 WL 1751482, at *7–8.  Here, as the SAC alleges, Defendants have copied a more specific

13   and unique expression of the idea of health status and energy from *BATTLEGROUNDS*.  *See* SAC

14   ¶ 60 ("*ROS* includes a health (hit points) bar with symbols located over it: a heart with a plus

15   symbol, which indicates regeneration, and a running symbol indicating increased speed, very similar

16   to *BATTLEGROUNDS'* boost bar.").  Defendants have likewise copied the features of the boost

17   items themselves, both in type (energy drink and syringe), effect (energy drink=hit points+speed;

18   syringe=health+speed), and source (syringe is available only via air drop).  *Id.*[2]

19   **Pre-Game Lobby and Waiting Area.**  Defendants contend that *BATTLEGROUNDS'* lobby

20   and waiting area is a "feature[] that exist[s] to teach players the rules of the game," but PUBG has

21   alleged that the pre-game lobby and waiting area serve multiple purposes and thus are necessarily

22   "[]distinguishable from the idea of the rules themselves."  *Cf.* Defs.' Mem. at 6:5–6.  The pre-game

23   lobby is unique because, while it may allow players to practice the controls, it serves a distinct

24   purpose of allowing and encouraging players to "talk to and interact with each other, practice firing

25   their weapon, and roam around the scene."  SAC ¶ 26.  *See Allen v. Acad. Games League of Am.,*

---

[2] Similarly, the "Down But Not Out" element (Defs. Mem. at 5:22) reflects a unique and protectable expression. Far from merging with the idea of "forcing players to kill each other," this feature allows players to *save* teammates that have been killed by crouching next to the fallen player for a pre-determined period of time.  *See* SAC ¶ 49.  In fact, this expression actually runs counter to the general "last player standing" theme, where each player's death is final and irreversible.

15

1    *Inc.*, 89 F.3d 614, 618 (9th Cir. 1996) (recognizing that copyright protection is warranted where "it

2    is possible to distinguish the expression of the rules…from the idea of the rules themselves").  In

3    short, the pre-play lobby reflects creative and expressive choices that are entirely distinct from the

4    idea of any particular rule in the game, and that Defendants directly copied (SAC ¶¶ 61, 92).

5         **Air Jump.**  Defendants assert that "[i]nherent in dropping players on an island …is a means

6    of accomplishing the drop."  Defs.' Mem. at 6:9–10.  However, Defendants' argument starts from a

7    false premise – there is nothing "inherent" in the nature of "battle royale" games that requires

8    "dropping players on an island."  On the contrary, the SAC alleges that there are various ways in

9    which players may appear in a "battle royale" game:

> In other shooter games, players "spawn" or just appear on the game play map in
> either a pre-designated or random location.  Rather than the typical spawning
> mechanic, BATTLEGROUNDS has created an interactive approach that allows the
> player to choose where to begin play on the game play map.

12   SAC ¶ 27.   In other words, "dropping players on an island" – particularly in a manner that allows

13   the *player* control over where she or he lands – constitutes PUBG's unique and protectable

14   expression of this element.  *See, e.g., Capcom I*, 1994 WL 1751482, at *7–8 (recognizing that where

15   "other ways of expressing the same idea were available to competitors," a copyright owner is

16   "entitled to have its particular expression protected").  These allegations must be taken as true.

17        **Equipment Acquisition/Weapon, Vehicle, and Equipment Spawning.**  Defendants' claim

18   that "start with nothing" is a "[b]asic rule[]" is both unsupported (the case they cite says nothing of

19   the sort) and impermissibly contradicts the SAC's allegation that "starting with nothing" and "mix of

20   random[] and fixed spawn locations" constitute PUBG's unique expression. (SAC ¶¶ 30, 42).

21        **Air Drops/Bombardment/Shrinking Gameplay.**  Defendants reference "Air Drops," but do

22   not discuss that feature.  As depicted in the complaint (SAC ¶¶ 78, 109), and reprinted below, PUBG

23   elected to have its supplies dropped in a large square crate, with a tarp covering the top portion and

24   straps securing the tarp; once it lands, a plume of red smoke reflects its location.  None of those

25   expressive elements is required by the "idea" of a supply mechanism (it could be a barrel, a bag, or a

26   shapeless bundle; it could be pre-existing, delivered by truck, or simply spawn; it could be marked

27

28

by a mylar balloon or an audio signal); *all* of them were copied by Defendants in *both* games.

 

*BATTLEGROUNDS*

 

*Rules of Survival*

 

*Knives Out*

Defendants also misapply the idea/expression dichotomy with respect to "shrinking gameplay." While Defendants contend that the genre "requires game mechanics to drive players together," Defs.' Mem. at 6:18–19, there is nothing inherent in that idea that requires that players be driven together by a shrinking white circle superimposed on the gameplay map (SAC ¶¶ 78–80, 109–111), as opposed to some other mechanism (*e.g.*, a gradually expanding radioactive storm, to take one example). It is *BATTLEGROUNDS'* unique and particular approach to forcing players together that is protectable, and which Defendants copied in *RoS* and *KO*.

**Weapons/Vehicles/Consumables/Clothing/Equipment/Configuration.** Defendants claim that these elements constitute *scenes a faire*, but ignore the SAC's allegations that identify unique,

17

1 creative choices that PUBG made respecting these elements, which Defendants then flagrantly

2 copied. *See, e.g.*, SAC ¶ 69 ("cheek pads" as attachments to weapons and with the "exact same

3 position" of the adjustments "despite the fact that this type of cheek pad is highly uncommon");

4 *supra* § III.A.3.a (discussing frying pan weapon/butt armor); *see generally* SAC ¶¶ 67–71, 98–102.

5      **"Winner Winner Chicken Dinner."**  While short phrases may not be independently

6 copyrightable, Defendants' copying of that phrase – uniquely associated with Defendants (SAC

7 ¶ 50) – is relevant to the infringement analysis, as it clearly reflects that Defendants were *copying*

8 *BATTLEGROUNDS*.  *See Spry Fox*, 2012 WL 5290158, at *6 ( "It is at least plausible to infer that

9 6Waves chose the title 'Yeti Town' because it was copying 'Triple Town,' and the trier of fact can

10 consider this inference as it considers the similarity between the two games.").

11      In sum, both as to elements that Defendants addressed and those that they ignored, the SAC

12 is replete with allegations reflecting protectable expression – choices that PUBG made from a wide

13 array of options, and that Defendants copied.  The SAC states a claim for copyright infringement.

14           *c.      The Alleged "Dissimilarities" Are Both Irrelevant and Incorrect.*

15      Defendants' argument that differences between the parties' respective games supports

16 dismissal (Defs.' Mem. at 9:11–10:27) fails for at least three reasons.  First, it is entirely based upon

17 extrinsic materials that should not even be considered on a motion to dismiss.  *See supra* § III.A.1.

18      Second, the argument is irrelevant.  It is well established that copyright infringement is based

19 on similarities between works; differences provide no defense.  *See, e.g.*, *L.A. Printex Indus.*, 676

20 F.3d at 851 (noting that "[i]t is entirely immaterial that, in many respects, plaintiff's and defendant's

21 works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can

22 be shown").  As Learned Hand wrote, "no plagiarist can excuse the wrong by showing how much of

23 his work he did not pirate."  *Sheldon v. MGM Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936).

24      Finally, many of Defendants' claimed "dissimilarities" are a fallacy, strategically inserted by

25 Defendants *after* this lawsuit was filed, in a clear attempt to mask Defendants' blatant infringement.

26 As set forth in greater detail above, elements that Defendants added *after* the original complaint was

27 filed in this action are now cited as "dissimilarities" allegedly relating to the "mood, themes, and

28 settings" (including addition of snow and lavender color), "air jumps" (including addition of

helicopters), "real-world weapons" (including addition of multiple weapons), and "fanciful

expression" (including addition of new clothing, "Damascus Knife," and "science fiction-esque

guns").  *See supra* III.A.1.b.  Defendants cannot escape liability for infringement by creating

differences after they've been caught.

> 4.    Alternatively, PUBG Has Adequately Alleged Substantial Similarity of the Overall Selection, Arrangement, and Combination of Elements in *BATTLEGROUNDS*.

For the reasons discussed above, PUBG has more than adequately alleged substantial

similarity between protectable elements in *BATTLEGROUNDS* and parallel elements in *RoS* and

*KO*.  But even if the court were to find that the common elements are not protectable, Defendants'

motion to dismiss must be denied.  Courts have repeatedly held that the selection, arrangement and

combination of *even unprotectable* elements may be protectable when taken as a whole.  *See, e.g.*,

*Swirsky*, 376 F.3d at 848 ("substantial similarity can be found in a combination of elements, even if

those elements are individually unprotected").

In *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002), the Ninth Circuit reversed summary

judgment, finding a triable issue of fact as to whether a script for a television show was substantially

similar to the plaintiff's work, even though the individual elements were unprotectable:

> [T]he similarities proffered by the Metcalfs are not protectable when considered individually; they are either too generic or constitute "scenes a faire."… However, the presence of so many generic similarities and the common patterns in which they arise do help satisfy the extrinsic test. The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element.

*Id.* at 1074.  The same principle is articulated (but ignored by Defendants) in cases that Defendants

cite.  *See, e.g.*, *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1445 (9th Cir. 1994) (stating

that "original selection and arrangement of otherwise uncopyrightable components may be

protectable"); *Satava*, 323 F.3d at 811 (9th Cir. 2003) (noting that "a *combination* of unprotectable

elements may qualify for copyright protection") (emphasis in original).[3]

This standard is readily satisfied here.  The complaint contains literally dozens of similarities

---

[3] This fact renders irrelevant Defendants' reliance on various weapons patents.  Defs.' Mem. at 8:19–9:4.  Even if the individual weapon design is not protected by copyright, the selection and combination of *dozens* of weapons, accessories, helmets, and other armor (SAC ¶¶ 67–74, 98–105), *as well as* unique qualities and characteristics associated with them (*e.g.*, SAC ¶¶ 72, 103 (same three "levels" of armor in each game)), that Defendants elected to copy is protectable under copyright.

1   between *BATTLEGROUNDS* and *RoS* and *KO*.  *See* SAC ¶¶ 51–81 (*RoS*); ¶¶ 83–111 (*KO*).  The

2   similarities commence at the outset of the game, and continue unabated through its conclusion,

3   covering elements both large and small.  Even if the individual elements are unprotectable, PUBG's

4   selection, arrangement, and combination of those elements qualifies for copyright protection.

5   **B.      PUBG'S Trade Dress Claims Are Adequately Alleged.**

6          **1.      PUBG's Trade Dress Claim Does Not Invade the Copyright Act.**

7          Defendants claim that PUBG's Lanham Act claim is precluded by the Copyright Act, relying

8   principally upon *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), and

9   *Touchpoint Comms., LLC v. Dentalfone, LLC*, 2015 WL 5918400 (W.D. Wash. Oct. 9, 2015), which

10  relies on *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990).  However, these cases are inapplicable.

11         In *Dastar*, Dastar copied and edited a television series that had been broadcast by Fox, but

12  which had fallen into the public domain; Dastar then sold the program on videotape as its own

13  product.  *Dastar*, 539 U.S. at 27.  Fox claimed that sale of the videos "without proper credit" to the

14  original series constituted "reverse passing off" in violation of the Lanham Act (*i.e.*, when "the

15  producer misrepresents someone else's goods or services as his own").  *Id.* at 28.  The Court held

16  that, in reverse passing off cases, the phrase "origin of goods" in section 43(a) of the Lanham Act

17  refers to the producer of goods, not the author of the content.  *Id.* at 37.  The Court therefore rejected

18  Fox's claim, explaining that allowing a Lanham Act claim for copying without attribution would

19  "create[] a species of perpetual patent and copyright, which Congress may not do."  *Id.*

20         However, district courts in California have narrowly construed *Dastar* (and its predecessor,

21  *Shaw*), applying them only to "reverse passing off" cases, and not to "passing off" cases (*i.e.*, when a

22  producer misrepresents his own goods or services as someone else's).  For example, in *Williams v.*

23  *Cavalli*, 2015 WL 1247065 (C.D. Cal. Feb. 12, 2015), defendants had placed imagery from

24  plaintiffs' mural on a collection of their clothing.  *Id.* at *1.  In addition to asserting a copyright

25  infringement claim, one of the plaintiffs alleged that defendants' "use of his…imagery created the

26  'false and deceptive impression that [defendants' clothes] are associated with and/or manufactured

27  by…Plaintiffs,'" and sought relief under the Lanham Act.  *Id.* at *5.  The court found that because

28  the plaintiff was asserting "passing off," rather than "reverse passing off," his claim was beyond the

1    reach of *Dastar* and could co-exist with plaintiffs' copyright infringement claim.  *Id.*; *see also*

2    *Sambonet Paderno Industrie, S.P.A. v. Sur La Table, Inc.*, 2015 WL 4498795, *5 (C.D. Cal. Jul. 23,

3    2015) (same).  In short, "a regular 'passing off' claim[] does not raise the 'perpetual patent and

4    copyright' concerns that the Supreme Court identified in *Dastar*." *Craigslist Inc. v. 3Taps Inc.*, 942

5    F. Supp. 2d 962, 978 (N.D. Cal. 2013).[4]

6         Here, PUBG alleges a "passing off" claim: the SAC alleges that Defendants' *RoS* and *KO*

7    games are likely to cause customer confusion as to the origin of Defendants' *RoS* and *KO* games,

8    "including whether they were developed by PUBG, are associated with PUBG or PUBG's

9    *BATTLEGROUNDS* game or were sponsored and/or approved by PUBG." (SAC ¶ 128.).  Thus,

10   Plaintiffs' Lanham Act claims are not precluded by the ruling in *Dastar* or the Copyright Act.[5]

11        2.    <u>PUBG Adequately Alleges the Protectability of Its Trade Dress.</u>

12        Defendants assert that PUBG has not adequately alleged that its trade dress is non-functional.

13   This argument fails both legally and factually.  As a legal matter, "the question of whether

14   [plaintiff's] trade dress is functional or nonfunctional is a factual one that cannot be resolved on a

15   motion to dismiss." *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1141 (N.D. Cal. 2010)

16   (citing *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1258 (9th Cir.2001)).

17        As a factual matter, PUBG *has* pled the non-functionality of its trade dress.  For example,

18   PUBG has listed various aspects of its trade dress that illustrate "elements of ornamental flair that

19   are **not functional** but have acquired secondary meaning" (SAC ¶ 127), none of which is discussed

20   by Defendants.  In addition, PUBG has included numerous images showing the elements and

21   combinations of elements of its trade dress, in addition to the "total image and overall appearance"

---

22   [4] Although this distinction was not credited in *Deckers Outdoor Corp. v. J.C. Penney Co.*, 45 F.

23   Supp. 3d 1181, 1185 (C.D. Cal. 2014), that court failed to identify *any* copyright interest implicated by the products at issue (boots), rendering it inapposite.  The remaining cases cited by Defendants

24   (Defs.' Mem. at 12 n.5) do not even address this critical distinction, which applies regardless of whether the products at issue are "tangible" or not.

25   [5] Moreover, the principle invoked by Defendants applies only (if at all) to the extent "the Federal Copyright Act provides an adequate remedy." *Shaw*, 919 F.2d at 1364–65.  While PUBG contends

26   that *no* aspect of Defendants' motion is meritorious, PUBG surely cannot have it both ways:  if any aspect of PUBG's *BATTLEGROUNDS* game is not copyrightable, PUBG's trade dress claim as

27   to that aspect survives.  *Salt Optics, Inc. v. Jand, Inc.*, 2011 WL 13055856, *3 (C.D. Cal. 2011)

28   ("There can be no 'adequate remedy,' however, if a work cannot be copyrighted…. A Lanham Act claim is thus permissible.").

of BATTLEGROUNDS.  These allegations more than suffice.  *See Mercado Latino, Inc. v. Indio Products, Inc.*, 2017 WL 1356315, at *2 (C.D. Cal. Apr. 11, 2017) ("Plaintiffs' relatively detailed description of its claimed trade dress is adequate to put defendant on notice, particularly in light of Plaintiff's inclusion of images of the claimed trade dress in the SAC."); *Diamond Foods v. Hottrix, LLC*, 2016 WL 3880797, at *12 (N.D. Cal. Jul. 18, 2016) (allegations that total image and overall appearance were not merely functional sufficient to state claim).[6]

## C.   PUBG Adequately Alleges Statutory Unfair Competition.

Defendants' attacks on PUBG's UCL claim are meritless.  The "unlawful" prong makes a violation of an underlying law a *per se* violation of the UCL.  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002). Thus, virtually any law or regulation – federal or state, statutory or common law – can serve as predicate for a § 17200 "unlawful" violation.  *People v. E.W.A.P., Inc.* 106 Cal. App. 3d 315, 319 (1980).  Because PUBG has adequately alleged a trade dress infringement claim, its UCL "unlawful" claim is likewise cognizable. *See, e.g.*, *Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1174 (N.D. Cal. 2015) (UCL "unlawful" claim could not be dismissed when underlying Lanham Act claim was sufficiently pled); *Morton & Bassett, LLC v. Organic Spices, Inc*., 2017 WL 1425908, at *10 (N.D. Cal. Apr. 21, 2017).

Case law likewise contradicts Defendants' argument as to the "unfair" prong.  An antitrust violation is not the only way in which unfairness can be alleged – any conduct that "significantly threatens or harms competition" falls within its ambit.  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999).  Thus, PUBG's trade dress claim can form the basis of the UCL unfairness claim as well. *English & Sons, Inc. v. Straw Hat Restaurants Inc.*, 2015 WL 4314364, at *13 (N.D. Cal. Jul. 15, 2015).

Finally, Defendants argue that PUBG cannot state a claim under the UCL's "fraudulent" prong because PUBG has not actually relied on any NetEase misstatements.  This, too, is incorrect.  To the extent that reliance is required, consumer confusion (and resulting reliance) arising from

---

[6] Even if certain elements are functional, "the fact that individual elements of the trade dress may be functional does not necessarily mean that the trade dress as a whole is functional; rather, functional elements that are separately unprotectable can be protected together as part of a trade dress." *OHC Group LLC v. Blip, LLC*, 2010 WL 1151227, at *4 (C.D. Cal. Jun. 7, 2010) (internal quotations and citation omitted).

1   Defendants' trade dress violations satisfies that requirement. *Openwave Messaging, Inc. v. Open-*

2   *Xchange, Inc.*, 2016 WL 6393503, at *6–7 (N.D. Cal. Oct. 28, 2016).  Defendants' reliance on

3   *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1002 (N.D. Cal. 2014), is inapt, as that case did

4   not involve any trade dress or trademark claims, and at most, it reflects one view on an issue as to

5   which "federal courts sitting in California disagree." *Heartland Payment Sys., Inc. v. Mercury*

6   *Payment Systems, LLC*, 2015 WL 3377662, at *7 (N.D. Cal. Feb. 24, 2015) (citing *VP Racing Fuels,*

7   *Inc. v. Gen. Petroleum Corp.*, 2010 WL 1611398, at *2 (E.D. Cal.) (customer reliance sufficient to

8   state a competitor's claim under the fraudulent prong of the UCL)).[7]

9   **D.    PUBG Adequately Alleges Common Law Unfair Competition.**

10          Just as the Copyright Act does not preclude PUBG's Lanham Act claim, it does not preempt

11   PUBG's common law unfair competition claim.  Indeed, Defendants' own cases support this

12   conclusion.  For example, in *Aquawood, LLC v. Toys "R" Us-Delaware, Inc.*, 2016 WL 10576620

13   (C.D. Cal. Mar. 10, 2016), the court acknowledged that "well-pleaded passing off claims are not

14   preempted by the Copyright Act," *id.* at *3; the plaintiff had simply failed to "plead a claim akin to

15   passing off." *Id.*  Here, in contrast, PUBG has specifically pled passing off.  *See supra* § III.B.1.

16          To the extent Defendants assert that common law unfair competition claims do not extend to

17   trade *dress* infringement, Defs.' Mem. at 15:20–22, that is also incorrect.  Legions of cases recognize

18   that protections under the Lanham Act and state common law are essentially coextensive, and

19   subject to the same standards.  *See, e.g.*, *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378,

20   1381 (9th Cir. 1987) (treating law respecting an "an action for trade dress infringement brought

21   under § 43(a) of the Lanham Act, the common law, or the law of unfair competition" as equivalent);

22   *see also Am. Economy Ins. Co. v. Reboans, Inc.*, 900 F. Supp. 1246, 1254–55 (N.D. Cal. 1994).

23   ───────────────────────────────

[7] Defendants also assert in passing that PUBG's "failure to allege lost sales…eliminates its UCL

24   standing." Defs.' Mem. at 14:2.  This, too, is meritless.  A "plaintiff can satisfy the [UCL] statutory
     standing requirements in innumerable ways."  *Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1197

25   (N.D. Cal. 2015) (citation and internal quotations omitted).  Among these are to "have a present or
     future property interest diminished" or to "be deprived of money or property to which [plaintiff] has

26   a cognizable claim." *Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal.
     App. 4th 544, 561 (2013); *accord AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 962

27   (N.D. Cal. 2014) (injury to market share is a cognizable injury under the UCL).  Here, PUBG alleges
     that Defendants "introduce[ed] the ROS and KO games to the marketplace at or below cost…to

28   capture mobile gaming market share before PUBG launched its own mobile version." SAC ¶¶ 56,
     88, 133, 138; *see also* SAC ¶¶ 124, 130, 135, 140 (allegations of monetary damage).

1   Date:  August 10, 2018                          SIDLEY AUSTIN LLP

2

3                                    By:  */s/ Steven S. Baik*

4                                   Steven S. Baik (SBN 184622)
                                    sbaik@sidley.com

5                                   Ryuk Park (SBN 298744)
                                    ryuk.park@sidley.com

6                                   SIDLEY AUSTIN LLP
                                   1001 Page Mill Road, Building 1

7                                   Palo Alto, CA 94304
                                   Telephone: +1 650 565 7074

8                                   Facsimile: +1 650 565 7100

9                                   Rollin A. Ransom (SBN 196126)
                                   rransom@sidley.com

10                                 SIDLEY AUSTIN LLP
                                 555 West Fifth Street

11                                 Los Angeles, CA 90013
                                 Telephone: +1 213 896 6047

12                                 Facsimile: +1 213 896 6600

13                                 Ketan V. Patel (pro hac vice)
                                 ketan.patel@sidley.com

14                                 SIDLEY AUSTIN LLP
                                 787 Seventh Avenue

15                                 New York, NY 10019
                                 Telephone: +1 212 839 5300

16                                 Facsimile: +1 650 839 5599

17                                 Amanda R. Farfel (SBN 288126)
                                 afarfel@sidley.com

18                                 SIDLEY AUSTIN LLP
                                 1999 Avenue of the Stars, 17th Floor

19                                 Los Angeles, CA 90067
                                 Telephone: +1 310 595 9661

20                                 Facsimile: +1 310 595 9501

21                                 *Attorneys for Plaintiffs PUBG Corporation*
                                 *and PUBG Santa Monica, Inc.*

22

23

24

25

26

27

28